IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NUR ZAYN,

Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA,

Defendant.

Case No. 3:25-cv-01190-JR

OPINION AND ORDER

RUSSO, Magistrate Judge:

Plaintiff Nur Zayn brings this action under the Employee Retirement Income Security Act ("ERISA"). Plaintiff challenges defendant Unum Life Insurance Company's decision, as the administrator for an employer-sponsored benefit plan (the "Plan"), to discontinue her long-term disability ("LTD") benefits. The parties cross-move for judgment on the record pursuant to Fed. R. Civ. P. 52. For the reasons set forth below, defendant's motion should be denied, and plaintiff's motion should be granted.

## STANDARDS

ERISA provides that a plan "participant" may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Where the parties have stipulated to *de novo* review, the court may accept that stipulation and evaluate the record *de novo*. *Rabbat v. Standard Ins. Co.*, 894 F.Supp.2d 1311, 1319 (D. Or. 2012) (citation omitted). This means that the court may "make factual findings, evaluate credibility, and weigh evidence." *Id.* at 1313.

Thus, "the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). "[W]hen the court reviews a plan administrator's decision under the *de novo* standard of review, the burden of proof is placed on the claimant." *Id.* at 1294. This burden "continues to lie with the plaintiff when disability benefits are terminated after an initial grant." *Id.* at 1296. In other words, the defendant need not furnish proof of medical improvement to terminate benefits; the dispositive inquiry surrounds whether the record as a whole demonstrates disability. *See, e.g.*, *Torres v. Reliance Standard Life Ins. Co.*, 2010 WL 276074, *8 (D. Or. Jan. 15, 2010).

## FINDINGS OF FACT

1. Plaintiff has a bachelor's degree in business marketing and a master's degree in business management and has worked as a project manager in the pharmacological field since 2006. AR 317-19 (doc. 18-1).[1]

[1] The administrative record before the Court – or "AR" – constitutes more than 3500 pages, but with some incidences of duplication. Where evidence occurs in the record more than once, the Court generally cites to the transcript pages on which that information first appears.

2. Since 2011, plaintiff has been employed by CVS, thereby becoming a participant in an ERISA-governed group Plan administered by defendant. AR 186, 318-19 (doc. 18-1).

3. To be entitled to LTD benefits, a claimant must prove a continuous "disability" that lasts through the Plan's 180-day Elimination Period and beyond. AR 200 (doc. 18-1).

4. For the first 24 months in which LTD benefits are paid under the Plan, the claimant must be disabled from her "regular occupation[2] due to sickness or injury [and] have a 20% or more loss in . . . indexed monthly earnings due to the same sickness or injury." *Id.*

5. After 24 months of LTD benefits, the claimant must be disabled from "any gainful occupation[3] for which [she is] reasonably fitted by education, training or experience." *Id.*

6. Payments stop and an LTD claim ends, in relevant part, "after 24 months of payments, when [the claimant is] able to work in any gainful occupation on a part-time basis but [does] not"; on "the date [the claimant is] no longer disabled under the terms of the plan"; or on "the date [the claimant] fail[s] to submit proof of continuing disability." AR 207 (doc. 18-1).

7. In October 2019, after struggling with physical and mental symptoms for months, plaintiff was diagnosed with Young-Onset Parkinson's Disease ("YOPD"), at which point she began treatment with neurologist Elise Anderson, M.D. AR 1874 (doc. 18-4).

---

[2] "Regular occupation" is defined as "the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." AR 218 (doc. 18-1).

[3] "Gainful occupation" is defined as "an occupation that is or can be expected to provide you with an income within 12 months of your return to work that exceeds . . . 60% of your indexed monthly earnings, if you are not working." AR 215 (doc. 18-1).

8. At her initial consultation with Dr. Anderson, plaintiff presented with complaints of progressive right-sided weakness and "more trouble at work with concentration and multitasking." AR 1874-75 (doc. 18-4). Her neurological exam revealed the following:

> **Higher cortical function**: Awake, alert, and fully oriented, with fluent speech, intact naming and repetition. Memory intact to recent and remote, normal fund of knowledge. Affect normal. No neglect to double simultaneous stimulation.
>
> **Cranial nerves**: Pupils equal, reactive to light and accommodation. Visual fields full to confrontation. Extraocular movements are intact with normal smooth pursuit and saccadic eye movements. V1-V3 intact to LT. No facial asymmetry, good lid strength and smile excursion. No dysarthria. Hearing is normal. Palate elevates midline. Shoulder shrug is symmetric. Tongue is midline.
>
> **Motor exam**: Faint masking. Normal bulk and tone without atrophy or fasciculation. Power 5/5 throughout. No drift. 1+ RUE postural and kinetic tremor, no rest tremor. l+ RLE rest tremor. No tremor on L. 2+ RUE and 1+ LUE rigidity, 2+ RUE bradykinesia, tr on L. See Motor UPDRS below.
>
> **Sensory**: Symmetric to temperature, light touch, position/vibratory sense in all four extremities. Negative romberg.
>
> **Coordination**: Normal finger-nose-finger, normal rapid alternating movements.
>
> **Reflexes**: Symmetric: reflexes with flexor response to plantar stimulation.
>
> **Gait**: Narrow-based, steady gait, no ataxia. Toe/heel walk and tandem gait are intact. Slightly dystonic appearing "lift" of R leg during casual gait.

*Id.*

9. Plaintiff returned to Dr. Anderson on October 14 and November 25, 2019. AR 1830-34, 1852-56 (doc. 18-4). Plaintiff began myriad medications to assist with her YOPD symptoms, some of which had side effects including nausea, fatigue, depression, impulse control disorder, and sleep attacks. *Id.* Her objective examination findings remained essentially unchanged during this period. *Id.*

10. Plaintiff also initiated physical and speech therapy, which she described as helpful. AR 1080, 1131, 1831 (doc. 18).

11. On January 31, 2020, Dr. Anderson noted that plaintiff was "doing very well." AR 1810 (doc. 18-4). Although her anxiety, stiffness, and tremor had been slightly worse over the past month, plaintiff had "just resumed exercise last week." AR 1811 (doc. 18-4). Plaintiff also reported having "a few panic symptoms with work presentations [and] struggling with sleep." *Id.*

12. Plaintiff thereafter saw Dr. Anderson two other times in 2020 (i.e., on May 10 and October 13) AR 1764-68, 1800-04 (doc. 18-4). At those appointments, plaintiff indicated she was "struggling with R sided rigidity and dragging her foot on the R," and that her YOPD "symptoms had progressed." *Id.* She was also finding the work environment "pretty stressful [and was] struggling a little with concentration and hours." AR 1766 (doc. 18-4).

13. At a January 25, 2021, telehealth follow-up with Dr. Anderson, plaintiff continued to report that work was stressful and she was having a hard time keeping up. AR 146 (doc. 18-1). She additionally complained of problems with processing speed, memory, freezing while active, and numb toes. *Id.* A physical examination was deferred, and plaintiff's medications were adjusted in an attempt to address her symptoms. AR 146-49 (doc. 18-1).

14. On April 27, 2021, plaintiff attended another telehealth appointment with Dr. Anderson. AR 122 (doc. 18-1). Plaintiff noted some dexterity problems and "a little more trouble with word finding and processing speed. Work is affected a little, she just can't be as productive as in the past and mental fatigue is more of an issue." AR 123 (doc. 18-1). Plaintiff's examination findings were essentially unchanged and Dr. Anderson reassured plaintiff that her "exam looks very good." AR 122, 125 (doc. 18-1).

15. During this time period plaintiff also continued with physical therapy, wherein she reported similar symptoms such as shooting pain, numb toes, and difficulty with gait, fatigue, concentration,

memory, decision-making, organization, and "completing appropriate tasks for work." *See, e.g.*, AR 1339, 1345 (doc. 18-3).

16. On June 28, 2021, plaintiff stopped working for CVS and submitted a claim. AR 179 (doc. 18-1). She listed the cause of her disability as Parkinson's, denoting cognitive impairment and difficulties "remembering details/focusing/multitasking." *Id.* Defendant placed her on short-term disability. *Id.*

17. On July 13, 2021, plaintiff established care with family nurse practitioner Heather Mary Pfeiffer. AR 154 (doc. 18-1). Plaintiff indicated she was "on leave from her work from home job working for Aetna insurance due to sequelae from her Parkinson's most specifically decreasing cognition after long meetings." *Id.* She reported that her "[r]ecent lumbar radiculopathy resolved with physical therapy and adjustment of stationary bike but now has lumbar spinal pain," which was "chronic" and "worse at night." *Id.* Ms. Pfeiffer referred plaintiff back to physical therapy and adjusted her medications to manage back pain symptoms. AR 159 (doc. 18-1).

18. On August 17, 2021, plaintiff saw Dr. Anderson. AR 256 (doc. 18-1). Plaintiff reported

> doing pretty well with mobility and balance, but more difficulty with typing, writing and fine motor issues. Cognitive changes have been challenging, difficulty with concentration and recall - this has affected her work performance and has been very fatiguing to try to maintain her work. Multitasking is very hard. She supposed to return to work next week but is unsure she can, is considering applying for disability . . . Mood is OK, good and bad days. Was getting lightheaded and PCP switched her to prn propranolol for anxiety. No hallucinations, no compulsivity but she has to be careful about shopping. Fatigue is primarily mental. Notes a little difficulty with things getting stuck in her throat.

AR 257 (doc. 18-1). Plaintiff's neurological exam revealed intact naming, repetition, recent and remote memory, and normal affect and fund of knowledge; faint masking and no tremor; "1+ R>LUE brady on finger taps and handgrasps, 1++ heel stops R>l. Prev: 2+ rigidity RUE, 1+ on L,

fairly normal in lower"; and a "[n]arrow-based, steady gait, [with] no ataxia. SI decreased arm swing on R." AR 259 (doc. 18-1).

19. Plaintiff resumed physical therapy in August 2021 and underwent a swallow test with a speech pathologist in September 2021. AR. 1296, 1315 (doc. 18-3).

20. On November 18, 2021, plaintiff returned to Dr. Anderson. AR 252 (doc. 18-1). She indicated "struggling with more cognitive changes and fine motor incoordination." *Id.* Plaintiff also clarified that she was "supposed to return [to work] Monday but she feels the same and does not think she can. Main complaint is cognitive changes, can't find words and stay focused on things. Anxiety also contributes . . . She feels her tremor affects her face a little more, and more mood lability . . . Not sleeping great [and having] some SI pain . . . She is not exercising as much due to pain." AR 253 (doc. 18-1). Dr. Anderson increased plaintiff's Mirapex dosage to help address these symptoms and referred her to a neuropsychological evaluation with Audrey Sherman, Ph.D. AR 252-53 (doc. 18-1).

21. On November 30, 2021, plaintiff initiated speech therapy after a two-year lapse. AR 1262-63 (doc. 18-3). Plaintiff explained

> that she is currently on leave for work because she can't sustain attention for reading longer materials and is experiencing word-finding difficulty Finds when she is watching a video she needs to have captions on as well in order to process what she is hearing. Very concerned with how this is impacting her ability to work is noticing it in her daily life as well but not as big of a deal if uses the wrong word when talking to family. Does have to avoid talking while driving as she is unable to focus on both at the same time . . . [her job requires] reading long contracts, thinking and responding on the spot to remember details from previous. Feels like the information is in there but she can't access quickly. Writing and proofreading emails is also very challenging and draining - takes several hours. Significant difficulty taking notes during meetings can't continue to listen while also taking notes. Meetings are over the phone. Still using planner and pacing strategies and they're very helpful.

AR 1263 (doc. 18-3); *see also* AR 1267 (doc. 18-3) (plaintiff "reports the following functional changes: poor endurance for reading, anomia, slow processing speed that impacts her ability to effectively compose vocational emails and participate in work meeting"). The speech pathologist's "assessment revealed impaired information processing speed for sustained visual attention tasks, impaired alternating attention and borderline impaired verbal fluency and mental flexibility, as well as signs consistent with reduced endurance for communication tasks . . . Of note [plaintiff's] performance significantly declined on all objective measures as compared to testing completed 2 years ago." AR 1267 (doc. 18-3).

22. As part of its initial LTD review, defendant discussed the claim with plaintiff on December 3, 2021. AR 242 (doc. 18-1). Plaintiff reported

> notic[ing] more [symptoms] at work, having a hard time keeping up. Thought taking time off would help but noticed even when not working still having the [symptoms], they are just less and less of issue when not a work thing. [She] advised mostly brain doesn't work w/ memory, has information in head and can't just pull it out when needs it, can't multi-task, has reduced attention span, and processing new info takes longer than used to. [She] has tremors, hands don't work like they used to, has weakness in muscles, [lower back pain], anxiety, imbalance.

*Id.*

23. On December 22, 2021, plaintiff applied for LTD benefits. AR 316-22 (doc. 18-1).

24. Defendant approved plaintiff's claim effective December 27, 2021 (following the Plan's 180-day Elimination Period). AR 302-06 (doc. 18-1). Defendant advised "benefits will continue as long as you meet the definition of disability in the policy" and that it would contact her regularly to verify continued eligibility. AR 303 (doc. 18-1). Defendant additionally instructed plaintiff to "immediately . . . advise of any changes in your medical condition, education/training, work status, contact information (address/phone number), or financial status." *Id.*

25. On January 31, 2022, plaintiff applied for Social Security Administration ("SSA") disability benefits. AR 363 (doc. 18-1).

26. On February 3, 2022, plaintiff returned to Ms. Pfeiffer for treatment of her worsening back pain. AR 1944 (doc. 18-4). Ms. Pfeiffer ordered an MRI and referred plaintiff to physiatry. AR 1947 (doc. 18-4).

27. On February 11, 2022, plaintiff underwent a neuropsychological evaluation with Dr. Sherman. AR 1963 (doc. 18-4). During the clinical interview, plaintiff reported

> initially notic[ing] cognitive changes in her work setting prior to receiving her [YOPD] diagnosis and she believes that these issues have progressed over time. She gave examples of "not tracking" what she is doing as well, making errors, difficulty with multi-tasking, and feeling slower to process. She admitted that her mind wanders and she becomes easily distracted, and that sometimes she has difficulty finding the word she wants or can say an incorrect word and not notice. She reported that she is able to do complex tasks but these take significantly more time and are "tiring" for her. Her partner, Tarver, has noticed that she can be slower to find words and sometimes does not pay attention as well as she used to. He also noted that she is a person who needs to stay busy to be happy.
>
> She is currently on leave from her job (since 6/21) which had been demanding and highly stressful. She does not believe that she can go back to work successfully in that field and is considering her options, including applying for disability . . . As Tarver mentioned, she does like to stay busy and is currently learning German, engaging in learning more astrology (which is one of her interests), and doing avid gardening. She has chickens and a dog, as well.

AR 1963-64 (doc. 18-4). In the "Behavioral Observations" section, Dr. Sherman wrote:

> She presented to the appointment early and accompanied by her partner, who had driven them. She was nicely dressed .and groomed and was fully alert and oriented. Her gait was steady and she did not exhibit noticeable motor abnormalities, although she did often get up to stretch her back and walk around due to pain that she explained occurs when she stays in one position for too long. Her vision and hearing seemed intact. Her mood was calm and pleasant with no evidence of emotional distress, while her social behavior was fully engaged, polite, and friendly. Her language comprehension was intact. Her speech was fluent and coherent. Ability to answer questions about her history and insight into her situation seemed fully intact, as well.

> During the assessment she was slow to retrieve information from her memory (improving with time), slow to sometimes absorb complex verbal information (improving with repetition), and slow to perform complex tasks (although she was quick on easier tasks). She organized a visual task well but was not consistent in organizing a verbal task . . . She did complain of mental fatigue after about one hour of testing, so one task was shortened and she did take a break. However, otherwise she was able to remain fully engaged with strong effort and reasonable energy. Her testing behavior was fully cooperative and motivated and these results are considered to be a valid reflection of her current functioning.

AR 1964-65 (doc. 18-4). Plaintiff generally performed well on the eleven tests administered by Dr. Sherman, but some deficits were noted. AR 1965-67 (doc. 18-4). Specifically,

> • Immediate attention span for digits was average/low average, and her span of 4 digits backward compared to 7 forward suggests relative difficulty with divided attention. Her ability to perform oral math word problems, a task requiring verbal divided attention, was high average, but she did request two repetitions of questions on the more complex items.
>
> • On a task of verbal memory for a short word list (administered rather than longer list due to her fatigue), she performed in the impaired range following the initial trial (4/9 words) but then improved quickly to the average range with repetition (8,8,9/9 words).
>
> • When asked to copy a complex geometric figure, her approach was well-organized. However, she did not effectively organize a list of words that she was trying to verbally learn . . . On tasks of verbal divided attention (i.e., mental arithmetic, digit span backward), she performed reasonably well but did demonstrate mild variability. On a complex problem-solving task required planning/sequency (Tower of London), she performed in the very superior range for strategy but in the borderline range for speed.

*Id.* In summary, the doctor stated:

> Results of this evaluation indicate that her intellectual abilities are within the average to high average range. She is performing within the expected range in most areas of functioning [but] is also demonstrating several areas of mild weakness. These include speed of complex problem-solving (borderline range), as well as mild variability in aspects of organization (more so for verbal information), verbal divided attention, and initial processing of verbal information on memory tasks (improving to the average range quickly with repetition) . . . This pattern of results suggests that she is experiencing mild cognitive slowing that is likely impacting her when she is performing complex tasks, as well as tasks requiring fast verbal processing . . . She is also experiencing (and demonstrating) some degree of cognitive fatigue, and this could be due to needing to use more mental energy to compensate for her slowed speed but could also be due to sleep issues related to

> back pain and/or fatigue associated with [YOPD] and its related symptoms. In general, however, she is performing quite well on most cognitive abilities, especially when she has plenty of time and works at her own pace, and her intellectual abilities are generally very strong at this time. Furthermore, her memory, once she learns and processes information, is intact. It is understandable that she was no longer able to function at the pace and stamina required for her old job, and moving forward it will be important that she select work and/or activities where she is able to function within some new constraints to maximize her abilities and minimize her weariness while also preserving her health.

AR 1967-68 (doc. 18-4). Dr. Sherman then listed a number of recommendations to assist plaintiff with her cognitive functioning (e.g. "[y]our attention is better when you are able to focus on one thing at a time, and this is especially true for verbal input, so you are advised to keep things simple and to try to concentrate on just one thing at a time with minimal outside distraction, particularly when you need to do a task that is complex or important"). AR 1968-70 (doc. 18-4).

28. On February 18, 2022, plaintiff obtained another MRI of her lumbar spine, which revealed "[m]ild bilateral foraminal stenosis" at L4-5 and LS-S1, and "[m]ild right foraminal stenosis" at L3-4. AR 1189-90 (doc. 18-3).

29. On February 28, 2022, plaintiff attended an appointment with Dr. Anderson. AR 1585 (doc. 18-4). They discussed Dr. Sherman's assessment and the fact that plaintiff's anxiety was better "now that she is not working." AR 1586 (doc. 18-4). Plaintiff reported "[p]lans to travel to Palm Springs next month." *Id.* Overall, Dr. Anderson described plaintiff as "very stable today." AR 1585 (doc. 18-4).

30. Plaintiff continued with physical and speech therapy through March 2022. AR 1195-1214, 1151-59, 1169-70. Plaintiff remarked to her physical therapist that the "exercises are not helping much and generally increase her pain." AR 1169 (doc. 18-3). The physical therapist observed that plaintiff continued to suffer from "instability d/t decreased coordination of proximal trunk stabilizers. Her signs and symptoms vary day to day. Barriers to her progress include [her

underlying] Parkinson's diagnosis." *Id.* Plaintiff informed her speech pathologist that she was having "mixed results" with therapy; the speech pathologist reinforced the recommendations outlined in Dr. Sherman's report, which were similar to the strategies she was already employing. AR 1151-52, 1195 (doc. 18-3). Plaintiff indicated she was "feeling good about potentially finding work that is a better fit for her current skills and abilities but also somewhat discouraged by difficulty processing verbal information and [the] need for strategies." *Id.*

31. On May 3, 2022, plaintiff consulted with Ryan Thompson, D.O., related to her back pain. AR 1176 (doc. 18-3). He reviewed her MRI and separately denoted: "Her exam is highly suggestive of a facet mediated component with potential sacroiliac joint irritation as well." *Id.* Plaintiff declined pain medications at that time, and Dr. Thompson referred her to chiropractic care and acupuncture after observing she had already tried "numerous rounds of physical therapy as well as oral medications." *Id.*

32. On May 30, 2022, plaintiff complained of "having more trouble with dexterity [and] fatigue" during an appointment with Dr. Anderson, although her "main complaint [was] brain fog." AR 1565-66 (doc. 18-4). Plaintiff's examination findings were unchanged and Dr. Anderson recommended introducing Adderall to help with "the brain fog and attention." AR 1565, 1567 (doc. 18-4).

33. Plaintiff went on a three-week road trip in September 2022. AR 1560 (doc. 18-4).

34. On December 8, 2022, plaintiff sought care from Ms. Pfeiffer for back pain. AR 1924 (doc. 18-4). She also reported problems with sleep and fixation (due to Adderall). AR 1925 (doc. 18-4).

35. On February 17, 2023, the SSA found plaintiff disabled as of November 1, 2022. AR 382 (doc. 18-1). In its letter, the SSA stated in the "Things to Remember for the Future" section: The doctors and other trained personnel who decided that you are disabled expect your health to improve.

Therefore, we will review your case in January 2024 . . . Based on that review, your benefits will continue if you are still disabled, but will end if you are no longer disabled." AR 384 (doc. 18-1).

36. On her 2022 tax filing, plaintiff listed a small amount of income outside of her receipt of LTD and SSA benefits (i.e., less than $5000). AR 662-69 (doc. 18-2).

37. On January 4, 2023, plaintiff presented for a follow-up appointment with Dr. Anderson. AR 1538 (doc. 18-4). At that time, plaintiff's "main complaint [was] brain fog . . . motor symptoms are pretty stable." AR 1539 (doc. 18-4). She reported "Adderall [was] helpful for attention/energy, she gets a second wind late in the evening and can have a little hyperfocused behavior like cleaning." AR 1540 (doc. 18-4). Plaintiff "note[d] more trouble with fine motor coordination. Balance is OK, R shoulder is stiffer; has not been exercising as much due to [lower back pain]. Face feels twitchy and quivering sometimes . . . Some toe numbness." *Id.*

38. In April 2023, plaintiff began obtaining injections to treat her back pain from Ryan Minarik, N.D. AR 1978-2009 (doc. 18-5).

39. On May 4, 2023, plaintiff saw Dr. Anderson. AR 1520 (doc. 18-4). Plaintiff continued to find Adderall "helpful for brain fog" and her "[t]witchiness [was] better." AR 1522 (doc. 18-4). However, she started to experience some issues with hallucinations in her peripheral vision, swallowing, and balance, but her main issues were associated with lower back pain and cognition. AR 1521-22 (doc. 18-4). Dr. Anderson characterized plaintiff as "pretty stable from a motor standpoint." AR 1521 (doc. 18-4).

40. On July 6, 2023, plaintiff started chiropractic treatment with Lori Brown, D.C., for her "Parkinson's related symptoms as well as low back pain." AR 2014-57 (doc. 18-5). Ms. Brown's records reflect that plaintiff traveled twice, regularly attempted to engage in gardening activities (which exacerbated her symptoms if she did too much), and moved a pressure washer on one

occasion and shoveled snow/ice on another (both of which caused a significant increase in symptoms). *Id.* These records also reflect that, even outside of these activities, plaintiff's symptoms waxed and waned despite the use of massage, heat, and stretching (all of which were helpful). *Id.*

41. On July 19, 2023, plaintiff provided an update to defendant, describing her physical restrictions as "fatigue, cognitive changes, poor balance, muscle rigidity, impaired ability to perform work related activities," and mental restrictions as "cognitive fatigue, attention disorder." AR 409-10 (doc. 18-1). She reported doing household chores, using the computer, attending appointments, and caring for her dog. AR 413, 418-19 (doc. 18-1). She also reported that she is able to operate a motor vehicle but "doesn't drive much because it gives her anxiety [and YOPD] affects her multitasking abilities." AR 418-19 (doc. 18-1). Defendant continued paying LTD benefits based on that information and a review of the medical record.

42. On October 27, 2023, plaintiff once again returned to Dr. Anderson. AR 644 (doc. 18-2). While her "[m]otor exam [was] quite stable," plaintiff continued to experience brain fog, irritability, forgetfulness, problems multitasking, and seeing "things in the periphery now and then." AR 644-45 (doc. 18-2). Dr. Anderson suggested that plaintiff's cognitive symptoms were "most likely a mix of progressive executive dysfunction and med side effects." AR 644 (doc. 18-2).

43. On November 14, 2023, plaintiff sought treatment with Ms. Pfeiffer for brain fog, cognitive slowing, and difficulty multitasking. AR 776-77 (doc. 18-2). Ms. Pfeiffer specified that "ADD is unlikely given that [plaintiff did] not have a lifelong sx of ADD and [her] cognitive complaint started after [YOPD] diagnosis," and adjusted plaintiff's dose of Adderall. *Id.*

44. On her 2023 tax filing, plaintiff listed a small amount of income outside of her receipt of LTD and SSA benefits (i.e., less than $5000). AR 671-80 (doc. 18-2).

45. During a February 28, 2024, telehealth appointment with Dr. Anderson, plaintiff reported being "mostly stable," but that the following symptoms persisted: brain fog, problems with limping and fine motor skills, and variable mood. AR 638-40 (doc. 18-2). And her brain fog "snuck back in" despite the increase in dosage provided by Ms. Pfeiffer. *Id.* Dr. Anderson characterized plaintiff as "overall stable, more fine motor impairment but main issues [continued to be] back pain and brain fog." *Id.*

46. Plaintiff and her partner took a vacation in the Carolinas in March 2024. AR 764-65 (doc. 18-2).

47. A repeat lumber MRI done on April 11, 2024, showed mild degenerative disc disease. AR 1661-62 (doc. 18-4).

48. On April 16, 2024, plaintiff presented for routine care with Ms. Pfeiffer; she reported fatigue. AR 758-62 (doc. 18-2).

49. On June 24, 2024, during a telephone update with defendant, plaintiff endorsed ongoing issues with her cognitive and executive functioning, as well as with her fine motor skills. AR 515-16 (doc. 18-2). In particular, plaintiff reported having issues with memory, being on time, multi-tasking, buttoning, balance, and holding onto items. *Id.* Plaintiff denied engaging in any vocational activities or receiving any other income (aside from SSA disability benefits), noting she lacked the attention span to work. *Id.*

50. On July 1, 2024, defendant elected to continue plaintiff's LTD benefits, explaining: "it is unlikely [plaintiff would be] able to return to work in a gainful capacity [and on a consistent or sustained basis] due to fatigue, cog decline, limited fine motor . . . Improvement not expected. Suggest keeping file in core for future annual update in 2025." AR 517-18 (doc. 18-2).

51. Despite this determination, defendant continued to review plaintiff's claim and, on July 9, 2024, discovered that she maintained an Instagram account with 600-plus posts. AR 521-42 (doc. 18-2). The majority of these related to astrology and some even promoted a business that plaintiff managed, which offered astrology readings for $120/hour. AR 521-42, 549 (doc. 18-2). Further, certain posts reflected that plaintiff traveled to the Carolinas and enjoyed being out in nature. AR 527, 532 (doc. 18-2). From there, defendant tracked down the website associated with plaintiff's astrology business, which included client reviews, direct links to appointments, various subscription packages, and gift certificates. AR 544, 546, 549, 551, 561 (doc. 18-2). In the "about me" section, plaintiff wrote:

> My astrology story began with I was trying to make sense of a really tough time in my life and understand some things about myself . . . I set off on a mission to reverse-engineer my birth time, and find my rising sign and put together my birth chart. After that, I wanted to help others get that level of self-discovery, validation and most importantly self-compassion. When I'm not reading charts, you can find me tending to my garden, exploring the PNW trails with [her dog] Mucho or holed up in a cabin in the woods.

AR 563 (doc. 18-2).

52. On July 15, 2024, plaintiff followed up with Ms. Pfeiffer. AR 751-52 (doc. 18-2). During that appointment they discussed plaintiff's imaging, the "efficacy of her Adderall to help with Parkinson related cognitive fog and its effectiveness," her "physiatry visit and pending insurance approval for ESI injections," and "[o]ptimal activity and lifestyle management to minimize stress and maximize well being." *Id.*

53. On July 22, 2024, plaintiff reported the following to Dr. Anderson:

> [she] continues to struggle with back issues, pain periodically exacerbated by gardening etc. She has seen physiatry [and is having more] trouble with sensory overload, hard to manage multiple inputs. More mild hallucinations of movement in periphery . . . Gets hyperfocused on tasks, really has to be careful with timing. Noticing some urgency. Adderall has been helpful. A little OH. Some dysphagia, stable and she is using speech therapy techniques.

AR 634-35 (doc. 18-2). Dr. Anderson ordered a "UA for the bladder symptoms" and encouraged plaintiff "to get a little more exercise." *Id.* Plaintiff's examination findings were unchanged at that time – i.e., she continued to have essentially normal neurological findings, although with some mild deficits (e.g., faint masking, some rigidity and clumsiness, decreased right arm swing, etc.). AR 636-37 (doc. 18-2).

54. On August 14, 2024, defendant's Senior Vocational Rehabilitation Consultant performed a vocational review to clarify the physical and mental demands of plaintiff's occupation. AR 687-688. (doc. 18-2). The review determined that the occupational demands were as follows:

> Physical Demands:
> Sedentary work: Mostly sitting, may involve standing or walking for brief periods of time; lifting, carrying, pushing, pulling up to 10 pounds occasionally.
>
> Occasionally – reaching (desk level), handling, fingering, keyboard use
>
> NOTE: The duties of this occupation would allow for changes in position for brief periods of time throughout the day.
>
> Mental/Cognitive Demands:
> Directing, controlling, or planning activities of others
> Making judgments and decisions
> Dealing with people

*Id.* Defendant then sent these occupational demands to plaintiff's providers and inquired if plaintiff could perform her former occupation.

55. Defendant hired a licensed investigator to surveil plaintiff at her home on August 21 and 22, 2024. AR 693-701 (doc. 18-2). Of the 16 hours the investigator was on site, he only observed plaintiff for approximately 10 minutes, during which she was seen rolling her recycling and compost bins to the curb (one at a time), and pulling up three handfuls of weeds (bending at the waist and placing the weeds in the compost bin one handful at a time). AR 693, 698 (doc. 18-2).

56. On September 12, 2024, defendant spoke with plaintiff to clarify her recent medical appointments and treatment providers, and to ask if there were any additional updates. AR 707-08 (doc. 18-2). Plaintiff provided the contact information for her chiropractor, endorsed no change in symptoms, and agreed to double check for any upcoming appointments. *Id.* In addition, she confirmed that she had not had any eligibility reviews or reassessments with the SSA. *Id.*

57. On September 26, 2024, Dr. Anderson completed defendant's occupation form and opined that plaintiff was not able to return to work. AR 744-45 (doc. 18-2). In explaining why plaintiff could not perform the physical demands, Dr. Anderson wrote: "imbalance, fatigue [due to YOPD] limit full time work." *Id.* In explaining why plaintiff could not perform the mental demands, Dr. Anderson wrote: "cognitive fatigue [due to YOPD] limits full time work." *Id.*

58. On October 4, 2024, plaintiff saw Ms. Pfeiffer for: "Trouble with cognitive function and executive function – decision making, anxiety at work bc of deficits [with] word findings when talking to coworkers." AR 820-21 (doc. 18-2). As with all of plaintiff's other exams, Ms. Pfeiffer noted at that time there was "no focal deficit present. Mental status: she is alert and oriented to person, place and time." *See, e.g.*, AR 758-62, 777-81, 905-07 (doc. 18-2).

59. That same day, Ms. Pfeiffer completed defendant's occupation form, likewise opining that plaintiff was not able to return to work. AR 813-14 (doc. 18-2). Ms. Pfeiffer highlighted plaintiff's cognitive deficits, and problems with word finding and memory, before noting plaintiff "has chronic neurodegenerative disease: Parkinson's which affects her daily mobility and cognitive function." *Id.*

60. On November 1, 2024, defendant's Clinical Consultant reviewed plaintiff's claim and concluded that, based on the updated records, documented exam findings, and plaintiff's current activity level, she did not have restrictions precluding her from work. AR 942-954 (doc. 18-2).

61. On November 10, 2024, Ms. Pfeiffer completed defendant's occupation form and opined that plaintiff was not able to return to work. AR 998-99 (doc. 18-2). In the narrative portion, Ms. Pfeiffer wrote: "[plaintiff] has MS + has daily s/sx which will be progressive as MS is a progressive disease. I do not see how she can hold down a regular job." *Id.*

62. At defendant's request, Joseph Antaki, M.D., reviewed plaintiff's records and opined in a report dated November 21, 2024, that the evidence presently did not support plaintiff's entitlement to LTD benefits. AR 1008-14 (doc. 18-3). Dr. Antaki first noted that "[t]he social media and business findings appear inconsistent with" plaintiff's inability to perform her own occupation, even though "[t]he physical and cognitive demand required to run this type of business remains unclear." AR 1010 (doc. 18-3). Dr. Antaki explained that, while plaintiff indicated difficulty with cognitive functioning including concentration and multi-tasking, the medical record since February 2023 (i.e., plaintiff's award of SSA benefits) "did not identify abnormalities, when cognition was assessed during the physical exams," describing routine examination findings from Dr. Anderson and Ms. Pfeiffer. AR 1013 (doc. 18-3). Concerning the physical side, Dr. Antaki noted that plaintiff intermittently increased her activity level as reflected in Ms. Brown's chart notes and had negative exam findings on February 15, 2024. AR 1014 (doc. 18-3). He also highlighted that "[a]bnormalities of motor function (extremities, gait) were not identified on direct observation on 8/22/24." *Id.*

63. On November 12, 2024, Dr. Anderson completed a rebuttal to Dr. Antaki's report. AR 983-87 (doc. 18-3). Dr. Anderson checked boxes reflecting that plaintiff was unable to meet the physical and mental demands of her prior employment. AR 983-84 (doc. 18-3). She also authored a letter specifying:

> Nur has been under my care for young onset Parkinson's disease since October 2019, a months after her diagnosis at age 37. She has experienced progressive

> generalized fatigue, gait instability and imbalance, as well as cognitive symptoms including difficulty with concentration, word finding, cognitive slowing, and cognitive fatigue. These are well documented in a neuropsychological evaluation dated 2/11/2022 with Dr. Audrey Sherman, and her symptoms have progressed since that time. Additionally, Nur suffers from chronic back pain and anxiety. This constellation of symptoms limits her ability to perform a typical work day of sitting/standing and using a keyboard. Her cognitive symptoms and the fatigue resulting from them limits her ability to perform the decision making, judgement, and social interactions with others required for successful performance in the workplace. Dr. Antaki queries why Nur cannot work when she has performed astrology chart analysis for clients; Nur clarifies that this has been a hobby she has pursued on Instagram that she has subsequently stopped due to her PD symptoms reviewed above, not a form of employment. In terms of her reported activities of traveling, hiking, and gardening that Dr. Antaki cites as incompatible with my physical exam findings, I can only comment that I encourage my Parkinson's patients to pursue all of these activities to the extent they are able as all are beneficial for their symptoms and are scaleable to their own limitations on a given day. Finally, I remind reviewers that Parkinson's disease is a permanent, progressive, incurable neurodegenerative disease and unfortunately Nur's ability to perform workplace tasks will continue to decline rather than reverse or improve.

AR 986-87 (doc. 18-3).

64. On November 25, 2024, Zeyad Morcos, M.D. – a neurologist – reviewed the record (also at defendant's request) and concurred with Dr. Antaki's opinion. AR 1018-20 (doc. 18-3). However, his opinion contained significant inaccuracies – namely, he recited information from another claim file and attributed it to plaintiff in reaching his conclusion. AR 1020 (doc. 18-3).

65. On November 26, 2024, defendant notified plaintiff that she was no longer precluded from working and discontinued benefits based on information obtained since SSA's original decision. AR 1028-34 (doc. 18-3). Defendant invited plaintiff to file an appeal if she disagreed with its claim determination, and to submit any additional information (including medical records) she would like considered. *Id.*

66. In early 2025, plaintiff sought routine care from Ms. Pfeiffer. AR 1591-94, 1597-03 (doc. 18-4). These visits do not include any physical or neurological exam findings. *Id.*

67. On January 30, 2025, Dr. Anderson authored another letter in support of plaintiff's LTD benefits claim, stating:

> Nur Zayn has been under my care for [YOPD] since October 2019, shortly after diagnosis at age 37. Her condition is progressive and has significantly impaired her ability to work, leading her to apply for disability benefits.
>
> She experiences generalized fatigue, gait instability, and balance issues, along with cognitive deficits, including difficulty with concentration, word retrieval, and cognitive slowing. These Impairments were documented in Dr. Audrey Sherman's 02/11/2022 neuropsychological evaluation and her symptoms have worsened since then. In addition, she suffers from chronic back pain and anxiety, both of which exacerbate her physical and cognitive symptoms.
>
> Given her constellation of symptoms. she is unable to sustain a full-time work schedule. Her limitations are as follows:
>
> • Physical Limitations:
>
> o She cannot engage in prolonged sitting or standing without exacerbating pain and fatigue and is limited to sitting for no more than 20 minutes at a time and for no more than three hours in a day in a work setting; she is limited to standing for no more than 20 minutes at a time and for no more than two hours in a day.
>
> o Her fine motor coordination is compromised, restricting her ability to use a keyboard or perform repetitive hand movements for extended periods. She is restricted from any time of work requiring the use of a computer keyboard or mouse.
>
> o Her gait, instability and balance deficits increase the risk of falls, and she is not suited to work requiring her to walk or stand.
>
> • Cognitive and Mental limitations:
>
> o Cognitive fatigue and slow processing speed prevent her from maintaining the sustained attention and executive functioning necessary for decision-making, problem-solving, and effective workplace communication.
>
> o Word-finding difficulties impair her ability to engage in high-level verbal tasks, such as complex discussions. presentations, or real-time decision-making.
>
> o The combined impact of fatigue, cognitive slowing, and anxiety significantly limits her ability to work in fast-paced or high-stress environments that require multitasking or adaptability.
>
> Although she is not entirely housebound and is able to participate in neurological exams, perform some household chores, and participate in some social activities, Parkinson's disease is a permanent, progressive, and incurable neurodegenerative condition. Given the young-onset of the disease in her case, it is likely to be particularly progressive, further reducing her ability to perform daily and occupational tasks over time. The median survival for young-onset Parkinson's

> disease patients is approximately 30 years after diagnosis, yet the condition has already caused significant, permanent disability in Nur, impacting her quality of life and functional capacity. It is my medical opinion that Nur is unable to sustain gainful employment due to her progressive physical and cognitive impairments, and her condition is expected to continue to decline.

AR 2062-63 (doc. 18-5).

68. On February 3, 2025, plaintiff returned to Dr. Anderson for treatment. AR 1415 (doc. 18-3). Dr. Anderson noted plaintiff was

> [c]ontinu[ing] to struggle with cognitive fatigue, difficulty with sustaining her attention and executive dysfunction – decision making, time management . . . [she] has BUE diffuse finger weakness on exam today . . . Motor exam is stable today but she is noting more motor fluctuations and we discussed decision making around starting levodopa . . .
>
> She is noting more difficulty with incoordination, dropping things if she is distracted – more of a multitasking issue than sensory/motor. Sequencing is more challenging, and difficulty typing. Voice is quieter and less clear. A little more difficulty with swallowing, small crumbs get stuck . . . Balance is a little more wobbly, not doing much exercise and plan to get back on bike but back hurts too much. She is noticing more wearing off/motor fluctuations, gets sluggish and stiff, drags R foot. Meds last 5 hours or so. Tarver notes that Nur has more trouble finishing tasks and maintaining focus on things like movies or even meals, Adderall has helped with her attention but it continues to be a struggle . . . now and then sees movement in the periphery. No compulsivity other than late night snacking. A little puttering around the house, tidying endlessly and struggling with time management.

AR 1415-17 (doc. 18-3). Plaintiff's "higher cortical function" exam continued to be unremarkable reflecting she was alert, fully oriented with fluent speech, and had intact naming and repetition, intact recent and remote memory, normal fund of knowledge, and normal affect. AR 1418 (doc. 18-3). Her motor exam also remained largely unchanged with faint masking, no tremor, "1+ BUE brady on finger taps (a little clumsy) and handgrasps," and "Tr heel stops R>L. l+ toe taps BLE. l+ RUE>LUE and tr RLE rigidity." *Id.* Dr. Anderson observed that plaintiff rose easily and walked with a "[n]narrow-based steady gait with no ataxia" but "SI decreased arm swing R." *Id.* Dr.

Anderson referred plaintiff to speech therapy, a follow-up neuropsychological evaluation, and nerve testing. AR 1416 (doc. 18-3).

69. A March 6, 2025, EMG of plaintiff's hands was unremarkable. AR 1113-14 (doc. 18-3).

70. On March 26, 2025, Ms. Brown authored a letter in support of plaintiff's LTD benefits claim:

> Ms. Zayn has been under my care at Sunstone Chiropractic since July, 2023 for chronic and progressive musculoskeletal conditions affecting her lumbar spine, sacral region, and lower extremities. Her condition significantly impairs her ability to perform activities of daily living and occupational tasks due to pain, joint dysfunction, and mobility restrictions.
>
> Ms. Zayn has been diagnosed with segmental and somatic dysfunction of the lumbar, thoracic, sacral. and lower extremity regions (ICD-10: M99.03, M99.02, M99.04, M99.06). Her condition has been exacerbated by physical activity, including prolonged sitting, standing, lifting, and bending. Despite conservative care, including chiropractic spinal manipulation, extremity adjustments, therapeutic exercises, pain relieving medications, manual therapy, and epidural steroid injection, she continues to experience persistent functional limitations.
>
> Examinations over the past year have revealed the following objective findings:
> • Spinal motion palpation indicates hypomobility. spasm, and end-point tenderness at L4/L5, L5/S1, T4-T8, and C1/C2, confirming joint dysfunction.
> • Extremity motion palpation shows restricted mobility and pain in bilateral hips, further limiting her weight-bearing capacity.
> • Palpation of musculature consistently identifies hypertonicity and tenderness in the quadratus lumborum, gluteus medius, piriformis, thoracolumbar fascia, and hamstring groups.
>
> Ms. Zayn experiences episodic flare-ups that incapacitate her for several days, as documented in encounters dated 09/26/2024 and 07/11/2024, where she reported being unable to walk due to radiating pain down her left leg. Additionally, she has difficulty with prolonged sitting and standing. Her pain is most severe in the mornings and after extended static positions, impacting her ability to maintain a consistent work schedule.
>
> Despite adherence to prescribed treatment, Ms. Zayn's pain levels remain significant (5-7/10 on the pain scale), with limited improvement. The requirement for continued spinal manipulation, soft tissue therapy, and therapeutic exercises indicates a chronic condition that is unlikely to resolve with short-term treatment.
>
> Based on objective clinical findings and functional impairments, it is my professional opinion that Ms. Zayn is unable to perform occupational duties that require prolonged sitting, standing, lifting, or repetitive movement of the lumbar

> and hip regions. These restrictions are substantiated by her history of recurrent flare-ups and her ongoing need for medical intervention. She is restricted to sitting for no more than 30 minutes at a time, and for no more than 2 hours in an 8-hour work day. She is restricted to standing/walking for no more than 30 minutes at a time, and for no more than 2 hours in an 8-hour work day. Should you require further documentation or clarification. you may contact me in writing at the fax number below.

AR 3372-73 (doc. 18-7).

71. On March 31, 2025, plaintiff's long-term partner authored a letter in support of her LTD benefits claim:

> Nur has been my partner for over 8 years. So I have seen, firsthand, the impact [YOPD] has had on her and the limitations it has imposed. For the first couple of years of our relationship, Nur was almost always participating in some sort of physical or social activity or adventure. And when she wasn't, she was likely planning one. Nur enjoyed a full and active life. She still does, but that looks very different nowadays.
>
> 8 years ago, Nur was a runner, climber, hiker and crossfitter. She summited Mount Saint Helens, ran multiple half marathons and participated in extreme obstacle courses on a regular basis. 8 years ago, Nur had a very active social life and many friends. 8 years ago, Nur worked very hard, took pride in her work and it showed. Because of her strong work ethic, she often worked long hours until she felt satisfied with her work. But when YOPD symptoms started emerging, it became increasingly difficult for Nur to keep up at work . . .
>
> After her diagnosis, Nur took an active role in managing her condition and symptoms. She went to speech therapy and physical therapy. She joined research organizations, and attended webinars. She downloaded apps and bought planners and trackers, most of which helped, to a degree. But YOPD is a progressive, degenerative disease. It was and remains extremely difficult to plan for and manage her condition, no matter how organized and regimented Nur could be.
>
> I've observed several symptoms worsening over the last 5 years. Nur's mental processing has slowed down. She is unable to absorb new information in real time and make decisions on the spot. When receiving new information, she is only able to retain a fraction of it. She asks to record it so that she can listen to it on her own time. She pauses it to take notes and adjusts the playback speed as needed. She has to do this in small chunks of time because it exacerbates her mental fatigue. Then it takes her additional time to let the information sink in so that she can begin to process it. And still, this process isn't always effective, and it certainly wasn't and isn't compatible with working full-time.

> Another cognitive change Nur struggles with is her inability to sustain focus for more than a few minutes at a time. Nur feels scattered and exhausted as tasks pile up that she is unable to complete. It's also hard to watch Nur struggle to find a word in the middle of a conversation several times a day. She prefers to find the word on her own over having people finish her sentences for her. In conversations, Nur's brain goes "blank" rendering her unable to complete her sentence.
>
> YOPD also impacts her affect, body language and tone. What often looks like apathy is actually a lack of control over her facial expressions. This has its own set of negative effects on communications and relationships of all kinds.
>
> Nur rarely drives anymore because driving requires multitasking and a high level of focus. It also flares up her tremors. I've been driving Nur to and from appointments on most days, both for her safety and my peace of mind. And in doing so, I witness what Nur has to navigate just to exist and how physically, mentally, and energetically taxing it is to be alert and advocate for herself in medical settings. To successfully do so in a 30-minute appointment is all she is capable of doing on any given day . . .
>
> It took Nur a long time to accept that her symptoms prevent her from being able to work. It is a grieving process that is still in effect. To this day, it is clear that she would work if she could.

AR 2070-71 (doc. 18-5).

72. Also on March 31, 2025, plaintiff's life-long friend authored a letter in support of her LTD benefits claim:

> My name is Amanda Soares. I have known Nur for over 20 years. She has been one of my closest friends for at least the last 15 of those years . . . To know Nur even 10 years ago, you would meet a multitasking marvel, an athlete, and career woman who could and would outperform everyone at work and play. We traveled every few months to explore the world. She ran marathons on a whim for fun. I have watched her run across a finish line on uneven ground carrying a 200+ pound person on her back. [YOPD] has taken all of that away from her. And, sadly, it is far from done stealing from her . . .
>
> Nur's voice has become softer making it difficult to hear and understand her at times. Her speech is slower and she often trails off mid sentence. She struggles with word finding and frequently uses the incorrect word without noticing. Her voice and her body shake or she freezes when she is overstimulated, overtired or just having a big emotion. Most background sounds are so distracting, she sometimes needs to wear noise-cancelling headphones, even at home, to reduce stimulation and disruptive sounds.

> The ways we communicate, interact and make plans have all changed. I must talk slower and pause longer for an answer, than before she became ill. Nur struggles to listen while writing or typing, often unable to process what I am saying simultaneously. I often send her video voice messages so she can watch them, a few seconds at a time, pause, take notes, and resume listening or replay them again as needed. She has shared that a detailed five-minute message can take her an hour or more to fully absorb, process, and note down . . .
>
> What she can do in a day, or a week is significantly diminished. Most errands or appointments demand her full attention, which exhausts her both physically and mentally. Often, she runs out of energy and focus just preparing for a task . . . When she is moving or engaging in any task, she must concentrate to avoid fumbling, tripping, or dropping things.
>
> Nur relies on notifications and reminders for taking medication, eating, drinking water, using the bathroom, showering, and feeding her dog. She must pause what she's doing before she gets distracted . . . She has to concentrate fully and intentionally on simple tasks, even to swo1llow, yet she frequently chokes on food or water and sometimes on her own saliva. She loses sensation in her toes and parts of her feet when she gets too cold. She carries hot pads and wears electric socks when it's below 50 degrees to avoid her feet going numb for hours . . .
>
> Nur did not leave her job lightly. She is stubborn, proud and was great at her job. She pursued every accommodation and adaptation she could find. But the demands of work were worsening her symptoms, while her symptoms had made it increasingly difficult to meet those demands. Since leaving her job, she has spent the last 4 years trying to maintain a sense of purpose and reimagine her life while tending to a progressive illness. She has tried to find new hobbies and activities she can manage and still be who she is at heart. It made her feel good to spend months, in short intervals, tinkering on building her website and setting it up. A single chart reading takes her a full week to prepare, in small pieces, but doing it made her feel happy and accomplished.
>
> Nur is doing her best to be as healthy, active, and functional as her disability allows her to be as her doctors recommend. Her hobbies, travels and social life allow her to experience joy, happiness and movement in her life. They do not erase her disability.

AR 2072-74 (doc. 18-5).

73. On April 1, 2025, plaintiff wrote a personal statement explaining and clarifying the nature of her symptoms:

> When I was diagnosed, I'd been a Product Manager at CVS Health for 8 years. My job was to create a comprehensive business case around a new concept and present

it to a leadership board to get an investment. I loved my job and I was very good at it. I was known for my ambition, thoroughness and resourcefulness. But for months, I'd been struggling. I was working long hours just to keep up. I was making mistakes, losing my train of thought and getting so flustered in the middle of presenting (my favorite part of my job) that I started experiencing very obvious tremors . . .

I changed departments at work. In my new role, I was able to move at a slower pace but I could not sustain the level of focus and attention to details necessary for reviewing and negotiating vendor contracts. I worried I'd miss a detail and cost the company hundreds of thousands of dollars or put the company at risk of litigation. I took some time off but as soon as I returned, my symptoms got worse and work became unmanageable. I took more time off and eventually my short-term disability claim turned into a long-term claim.

Still determined to not let YOPD win, I decided to adopt a new hobby in an attempt to feel productive. I found joy in learning astrology and reading astrological charts. My intention was not to conduct a business or make a living as an astrologer, and I would not have been able to do so, given the cognitive demand of preparing for a single chart reading – a task that took me up to 5 hours spread out over a week in 20-30 minute intervals. I wanted to exercise my brain and feel a sense of fulfillment. But, as YOPD reminded me every day, my time and energy are limited. So I accepted payment in exchange for readings. I also offered free readings to make astrology accessible to all. In 2023, I received $1,680 for 14 chart readings. In 2024, I received $300 for 4 chart readings. Unfortunately, the cognitive decline has increasingly limited, and continues to limit, my ability to engage in astrology and other hobbies. I used the money to pay for a website, scheduling tool and other adaptations that helped me make my hobby a little less taxing on my brain. I started an Instagram account and a website to share my thoughts on astrological events. I wrote a short bio on my website for others to get to know me. In that, I listed hiking as an interest because it is something I loved and, at the time, had hoped I would be able to do it again. However, the last time I hiked was in 2019 and the photo of me hiking with my dog was taken in 2018.

I also enjoy gardening immensely. It is a low cognitive energy pursuit that brings me great joy and allows me to spend time outside. On days when the weather is favorable and my back pain level is between 4-6 on the pain level scale, I can spend 10-15 minutes weeding without increasing my back pain level to an 8. I change positions or posture frequently and I purposely use a small bucket to collect the weeds so that it fills up faster, forcing me to get up, move around and take a break. I try to avoid strenuous tasks, such as heavy lifting or shoveling, However, eventually the yardwork piles up, so I push through the pain in order to get the work done before the weather turns. This ends up increasing my pain level to a 7 or greater. To minimize this, I request assistance from friends or I pay someone to do the work that I am unable to do. But I can only do so occasionally as my finances are limited and help isn't always available.

I've also loved traveling since childhood. Before the onset of my symptoms, I would travel internationally every couple of years and had been to over 20 countries. I also enjoyed exploring; different states with my partner or my best friend several times a year . . . The last time I traveled internationally was in 2023, a trip I had originally purchased in 2019, before my symptoms worsened, for 2020. When I was finally able to take that trip, after the COVID shutdown, I chose less physically demanding activities, moved at a slower pace, took frequent breaks and opted for rideshares instead of walking, such that I was able to incorporate more walking than usual without flaring my symptoms. In 2024, my partner and I took a hybrid road trip, choosing to fly so we could get there faster and reduce how long I had to sit. He then rented a car and drove the rest of the trip so that we could make more frequent stops. On average, I was able to sit in the car tor 4-5 hours max per day, stopping at least once every hour to stretch or walk around. Even with that, my pain level was 6-8 and some days, all I was capable of doing was resting and enjoying the view outside the hotel room.

I am encouraged by my providers to pursue all of these activities to the extent I am able to. That extent changes as my symptoms progress . . . On a typical "better" day, I wake up around 7:00 AM. I spend an hour or so planning my day to make sure I have enough time for chores, errands or appointments. I set alarms and reminders. I allocate time to review any emails, voice messages or mail that require my attention or a response. Sometimes I have forms or documents to complete. On a typical "better" day, I am able to push through the cognitive and physical fatigue long enough to complete a few house chores that have piled up. I spend 2-4 hours per day cumulatively attending to chores and light yard work, break up chores into intervals when I am able to do so and try to give my body time to rest and recuperate in between and after. I prepare my own meals. This takes time because I must perform most tasks singularly . . .

Sometimes I push too hard because I don't know when my next "better" day will come. But pushing past my capacity ultimately costs me days of doing very little aside from managing the minimum of tasks of daily living and letting my body recover. Sometimes I have no choice but to push myself. Such was the case after an ice storm last winter. I was forced to shovel snow and ice off of my front steps and walkway so that I don't put myself, my partner or the mail carrier at risk of falling. I was in excruciating pain for several days even after a visit to my chiropractor and massage therapist.

On a typical worse day, my back pain wakes me up before 6:00 AM and my brain is already foggy after sleeping less than 5 hours. This typically happens about 4-5 days per week. On a worse day, I can't drive because it requires more locus and multitasking skills than I am capable of that day. Even walking while holding a glass of water re1uires me to actively and continuously focus on maintaining my grip on the glass. If I shift my attention for a moment, my grip will loosen and the glass will fall and shatter because my brain "forgets" to tell my muscles to keep

> doing what they're doing. Then I have to spend energy I can't spare cleaning up glass before I or my dog get hurt.
>
> On a worse day, I forget to eat, drink water and empty my bladder because my brain misses signals like hunger and thirst If I miss one of the many phone reminders for these basic bodily needs and functions, I may only have 10 seconds to make it to the bathroom and I am not always successful in doing so. On a worse day, I forget my own phone number. I forget my debit card pin while paying for my groceries, I forget if I've fed my dog dinner.
>
> At first, the better days outnumbered the worse ones. I would estimate that five years ago I had 20-25 good days per month and the rest were worse days. Now, it's the other way around. I try my best to live a healthy life within the bounds of my disability [but it] is very real. It is progressive. It is incurable. It does not improve. And it does not allow me to fulfill the duties of a full time job with any consistency, reliability or in a sustained manner.

AR 2066-69 (doc. 18-5).

74. That same day, plaintiff, through counsel, appealed defendant's decision. AR 1078-1106 (doc. 18-3). In support of plaintiff's appeal, counsel wrote a lengthy briefing summarizing the medical record in painstaking detail. *Id.* Counsel also submitted the following evidence:

> 1. Dr. C. Mitchell Finch (Neurology), record dated September 10, 2019;
> 2. Providence Health and Services, records dated September 17, 2019, through March 6, 2025;
> 3. Dr. Elise Anderson (Neurology), records dated October 4, 2019, through February 3, 2025;
> 4. Heather Pfeiffer, FNP, (Primary Care), records dated July 13, 2021, through February 24, 2025;
> 5. Dr. Audrey Sherman, neuropsychological evaluation, dated February 11, 2022;
> 6. Dr. Sarah Yoon (Physiatry), record dated July l, 2022;
> 7. Dr. Ryan Minarik, records dated April 4, 2023, through January 1, 2024;
> 8. Dr. Lori Brown (Chiropractic), records dated July 6, 2023, through March 25, 2025;
> 9. Providence PMG Glissan Clinic's response, dated March 26, 2025, to our request for a complete record of NP Pfeiffer's October 4, 2024, response to Unum;
> 10. Dr. Anderson, letter, dated January 30, 2025;
> 11. Dr. Brown, letter, dated March 26, 2025;
> 12. Statement of Ms. Nur Zayn, dated April 1, 2025;
> 13. Statement of Mr. Tarver Hannant, Ms. Zayn's partner, dated March 31, 2025;
> 14. Statement of Ms. Amanda Soares, Ms. Zayn's friend, dated March 31, 2025.

AR 1078 (doc. 18-3).

75. On April 23, 2025, Kathleen Rhyner, Ph.D. – a psychologist – reviewed the record at defendant's request and tasked with responding to the following questions surrounding Dr. Sherman's February 2022 assessment: (1) "If the neuropsychological testing was valid, what level of cognitive function is demonstrated? (If the testing is not valid, please explain why it is not valid and whether any conclusions regarding the testing can be drawn)"; and (2) "Did this evaluation adequately assess the impact of psychological factors? If so, what, if any, contributing psychological factors are recognized; and if not, please explain why not and whether any psychological conclusions regarding the testing can be drawn." AR 3389 (doc. 18-7). As to the first question, Dr. Rhyner replied:

> no performance validity measures were included in the evaluation. Therefore, the validity of these results is unknown. As such, these results only indicate the claimant's minimum level of achievement in these domains, although the claimant's true level of cognitive functioning may be higher.
>
> Despite the lack of performance validity testing, the claimant's performance across cognitive domains does not indicate any evidence of impairment. The claimant's performance on tasks of intelligence, attention/working memory, learning and memory, language, visual-spatial skills, processing speed, and executive functioning was in the average to high average range. The claimant had one low score on a singular memory trial and one element of an executive functioning test, which are well within expectations for normal statistical variability in testing for a battery of this size. The claimant's results are consistently intact across all domains and the results clearly do not indicate impairments in any cognitive domains that would be expected to result in functional impairment.

*Id.* Concerning the second question, Dr. Rhyner asserted:

> This evaluation did not adequately assess the impact of psychological factors. Dr. Sherman did not assess psychological factors with any psychological testing. The claimant reported a history of anxiety that has increased since claimant's diagnosis of Parkinson's during the clinical interview; however, this was not formally assessed in any way. Ultimately, there is no evidence of psychological symptoms of a consistency or severity that would account for the claimant's cognitive complaints or otherwise result in functional impairment.

AR 3389-90 (doc. 18-7).

76. On May 1, 2025, defendant obtained a peer review report from Kaiwen Lin, M.D. – a neurologist – who reviewed the complete record and proffered an opinion as to plaintiff's entitlement to LTD benefits. AR 3397-3401 (doc. 18-7). Namely, his report summarized portions of the medical record and then concluded that "[e]xaminations across providers do not support R/Ls that would preclude EE from performing sedentary level occupational requirements," citing to Dr. Anderson's July 22, 2024, and Ms. Pfeiffer's October 4, 2024, examination findings. AR 3400-01 (doc. 18-7). Separately, Dr. Lin found: "Although EE claims impairing cognitive difficulties, examinations across providers do not support cognitive R/Ls." *Id.* As support, Dr. Lin referred to Dr. Sherman's February 2022 evaluation (and Dr. Rhyner's conclusions about that evaluation). *Id.* He additionally generalized surrounding the nature of YOPD:

> Although YOPD is an unfortunate diagnosis for EE to be contending with, the trajectory of YOPD is well understood to be milder with noticeably slower progression than typical onset or late onset Parkinson's disease, with YOPD patients able to maintain physical function and intact cognition well beyond the typical timeline seen in a later onset PD presentation.

*Id.* He then evaluated plaintiff's back pain, citing to isolated chiropractic chart notes, the 2024 MRI, and the 2025 EMG study. *Id.* Finally, the doctor referred to plaintiff's online activity surrounding Instagram and her astrology business, as well as the investigative report which showed her weeding for 10 minutes (he also repeated the same inaccurate information outlined in Dr. Morcos's November 2024 relating to another claimant). Finally, Dr. Lin identified plaintiff's medications – i.e., "Adderall, Vitamin D3, Allegra, Mirena, meloxicam, pramipexole, Artane, or amantadine" – and concluded that neither the side-effects associated therewith nor any of her conditions, individually or collectively, would preclude her from performing her own occupation "as of 11/27/2024." *Id.*

77. On May 7, 2025, defendant sent plaintiff's counsel a letter denying her appeal but inviting her to submit additional information prior to a final determination. AR 3438-39 (doc. 18-7).

78. On May 23, 2025, Dr. Anderson completed another LTD disability opinion. AR 3456-57 (doc. 18-7). She reiterated that plaintiff was unable to work due to the combination of her physical and mental impairments associated with YOPD. *Id.* She also expressly stated that plaintiff's statements about her symptoms were consistent with the medical findings. *Id.* Dr. Anderson also clarified that recreational activities and exercise were "recommended as part of the plan of case," and specifically refuted Dr. Lin's statements about the extent of plaintiff's mental impairments: "She has relatively mild motor symptoms, more prominent cognitive impairments, and has had typical progression." *Id.*

79. On May 28, 2025, plaintiff submitted a second personal statement:

> Unum approved my benefits knowing that my disabling condition, Parkinson's Disease, is progressive and degenerative. Unum knew then and knows now that Parkinson's Disease does not improve, but predictably worsens. My incurable condition has not, all of a sudden, gotten better, as Unum claims . . . Parkinson's Disease affects nearly every one of my bodily functions. It affects my grip, my gait, my affect, my ability to control my muscles and my voice. It creates panic and anxiety symptoms, even though I do not feel panicked or anxious. It affects my vision, my memory, my attention span, even my sense of smell. It makes me not able to trust or rely on my brain and body because I never know when they will fall me. And being unable to rely on them, I cannot reliably or consistently perform any job function.
>
> Unum asserts my cognitive deficit complaints and my inability to perform occupational demands are inconsistent with the following, to which I respond below:
>
> **• No updated MRI brain spect DATSCAN since 9/20/2019**
> Neither an MRI nor a DAT Scan can show progression of Parkinson's Disease. An MRI is used to rule out other conditions such as a brain tumor. And a DAT scan shows if there is a diminished level of dopamine . . .
>
> **• 2022: Plan to look for suitable work**
> This reference is from over 3 years ago, At the time, I felt good because the neuropsychological evaluation helped me identify cognitive functions that had not

yet been impaired by the progression of Parkinson's Disease. It felt good in comparison to the deficits that months of Speech Therapy had failed to "fix."

Since then, I have not been able to seek a job because my cognitive functions have progressively become more impaired and unreliable. I know I am unable to work effectively when I'm unable to find a word or when I cannot retain simple information seconds after receiving it. Even when I try to take notes, I have to stop listening to do so because my impaired cognitive function cannot simultaneously listen and absorb information while I am writing or typing notes. Even my ability to recall information I use daily is tenuous. At times, I have stood outside my own house for 5 minutes because I cannot remember my door code. I have my own phone number written down because I'm often unable to remember it on the spot.

I cannot tolerate performing tasks with ambient sounds, lights and other stimuli because I become flooded with sensory overload. Nor am I able to predict which sounds, lights or other stimuli will overwhelm me on any given day. Most days, my brain does not register signals indicating that my bladder is full until it's an emergency. These problems prevent gainful employment. And my symptoms will only continue to get worse.

**• Website photos/statements - when not reading charts, she could be found tending her garden. exploring the PNW trails with her dog or holed up in a cabin in the woods. Pictures of herself and her dog hiking nature trails**
Please refer to my written statement submitted with my appeal. To reiterate, I've not been able to practice astrology for over a year. I have not been able to hike in over 5 years. I still garden even when it hurts my back because I still need to experience joy in my life from time to time.

**• Managed multiple social media platforms including online scheduling**
As described in my appeal, the scheduling tool was actually an adaptation to reduce the cognitive demand as I sought to enjoy this hobby.

**• 2023: 2 week trip abroad**
I did not take this 2-week trip alone. I was with my partner, who does not have Parkinson's Disease. He handled the planning and scheduling because when I try to do so, I frequently end up either scheduling things on the wrong day or putting the wrong date in my calendar. This is both a frequent occurrence in my daily life and also the reason I opted to use a scheduler when I was practicing astrology.

**• Power washing**
I also addressed this in my previous statement. I attempted to use a power washer exactly one time. I hurt my back badly while lifting and using it and sought help as soon as I was able to. I no longer use a power washer or similarly demanding devices. For example, I recently hired someone to shovel mulch instead of doing it all myself. Unfortunately, my finances do not allow me to hire out every task and chore.

> **• 7/6/24 posts: Has chickens and a dog**
> It is infuriating to have to address this. I also have a house, a car and some plants. I've kept backyard chickens for over 10 years. And I've had my dog for at least 8 years. I had them before Unum first approved my benefits. They weren't relevant to my claim of disability, and they're not relevant to my continuing disability now[.]
>
> **• Low back pain after shoveling snow**
> Thankfully it doesn't snow very often where I live. But when it does, it often turns into ice very quickly. So even though I know I will be in excruciating pain afterwards, I shovel snow and ice out of fear and worry that I, the mail carrier or someone else will slip and fall.
>
> **• March 26, 2024 trip planned, flying and driving for several hours at a time later that day**
> My travels in 2023 (2 weeks) and 2024 (2 weeks) did not exacerbate my pain because I was able to go at my own pace and do as much or as little as my back could handle each day. I don't travel like I used to. I no longer have a checklist of all the sites I want to see. I move slowly. I avoid crowds and strenuous activities that involve hiking or walking on uneven terrain or that require being on my feet for too long. I'm also not weeding, planting or raking leaves when I travel. Nor am I sitting at a desk for 8 hours. I use miles or upgrade when I'm able to. I read reviews describing the hotel beds, I tack on an extra day or two of rest when I can. The trip I took in 2024 included both air and car travel. We intentionally planned it that way in order to minimize the time I would be sedentary (air) while providing the flexibility of stops and seat adjustment (car) . . .
>
> **• Late 2024 improvement in reported LBP**
> While my cognitive symptoms are the ones I am most disabled by, my back pain compounds my disabling symptom load. Improvements in my low back pain have been intermittent. And in between them, there are also stretches of worsening pain . . . As was the case with my prior statement, I prepared this statement over several days, with help.

AR 3458-60 (doc. 18-7).

80. On June 9, 2025, defendant upheld its appeal decision on the grounds that the evidence no longer supported that plaintiff was unable to work beyond November 26, 2024, and thereby terminated plaintiff's LTD benefits. AR 3464-72 (doc. 18-7).

## CONCLUSIONS OF LAW

1. The Plan at issue is governed by ERISA.

2. The parties agree that this matter is governed by the *de novo* standard of review. Joint Stipulation 1 (doc. 22). Accordingly, a Rule 52 motion is the appropriate mechanism for resolving the dispute. *Rabbat*, 894 F.Supp.2d at 1314.

3. The Court's review is limited to the stipulated administrative record.

4. There is no dispute surrounding plaintiff's entitlement to short-term disability benefits under the Plan or LTD benefits during the first 24 months of payment. The parties likewise do not dispute the meaning of the Plan's terms. Accordingly, this case hinges on whether plaintiff has demonstrated she is unable to perform "any gainful occupation" – i.e., "an occupation that is or can be expected to provide . . . income within 12 months of [working] that exceeds . . . 60% of [plaintiff's] indexed monthly earnings" – "for which [she is] reasonably fitted by education, training or experience." AR 200, 215 (doc. 18-1).

5. The Court finds that plaintiff has established her entitlement to ongoing LTD benefits under the Plan.

6. All of the long-standing providers who have personally examined and treated plaintiff opined that she is totally and permanently disabled. Significantly, Dr. Anderson proffered five disability opinions and has been plaintiff's treating neurologist since the onset of her illness. Her chart notes document both subjective and objective evidence corroborating the extent of plaintiff's YOPD (which, beyond the initial diagnostic testing, appears to be managed based on the constellation of symptoms presented). *Cf. Veronica L. v. Metropolitan Life Ins. Co.*, 647 F.Supp.3d 1028, 1043-44 (D. Or. 2022) (emphasizing that "[m]any conditions depend on subjective symptoms for diagnosis and cannot be objectively established," before concluding that a plan administrator errs by failing to consider a claimant's self-reported symptoms in regard to "conditions like CFS, for which no objective tests exist"). And her most recent chart notes reflect an increase in neurological

symptoms. *See, e.g.*, AR 1415-16 (doc. 18-3). Dr. Anderson specifically responded to defendant's occupational inquiry surrounding the physical and mental requirements of plaintiff's own occupation (opining that plaintiff cannot perform either), rebutted Dr. Antaki's report, authored two detailed letters clarifying the nature and extent of plaintiff's symptoms and activities in support of her LTD claim, and completed a form prepared by plaintiff's attorney addressing salient aspects of defendant's denial of plaintiff's appeal. AR 744-45, 983-87, 2062-63, 3456-57 (doc. 18). "This evidence alone is persuasive evidence [that plaintiff] is totally disabled," especially given the consistency of plaintiff's symptom reporting and the fact that there is otherwise nothing in the record to suggest plaintiff has overstated her symptoms or is not credible. *Rabbat*, 894 F.Supp.2d at 1320 (citing *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676-79 (9th Cir. 2011)).

7. The records and opinions of Ms. Pfeiffer and Ms. Brown – which are largely consistent with Dr. Anderson's in every relevant aspect – further support plaintiff's inability to perform "any gainful occupation." *See, e.g.*, AR 813-14, 2014-57, 2272-74 (doc. 18). The fact that Ms. Pfeiffer, on one occasion, misidentified plaintiff's underlying condition as multiple sclerosis – or "MS" – instead of YOPD does not undermine her assessments given the tone and the content of the record as a whole. In so finding, the Court notes that, given the particular facts of this case, nothing in Ms. Pfeiffer's routine examination findings contravene her opinion that plaintiff would experience significant concentration and persistence limitations in a work setting. Indeed, these findings are a part of and factored into her medical opinion.

8. Defendant maintains that the opinions of plaintiff's doctors are not determinative because they are based on plaintiff's "subjective reporting." Def.'s Rule 52 Mot. 30 (doc. 25). Relatedly, defendant contends "Dr. Sherman's testing was not entirely objective because she did not employ

validity measures which are necessary to ensure full effort . . . [even so] Dr. Sherman made no diagnosis of cognitive impairment." *Id.* at 32. While defendant is correct that a treating or examining provider may not simply adopt a claimant's subjective complaints, here there are a number of objective metrics establishing YOPD and symptoms associated therewith (which defendant accepted in first granting LTD benefits). *Cf.* *Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F.Supp.2d 1090, 1101 (C.D. Cal. 2009), *aff'd*, 409 Fed.Appx. 99 (9th Cir. 2010) (under ERISA, an administrator may not "accept a conclusion in a medical report without considering whether that conclusion follows logically from the underlying medical evidence"). Similarly, the allegedly incompatible objective testing on which defendant relies – i.e., Dr. Sherman's assessment – in fact showed "several areas of mild weakness," despite plaintiff's strong intellect and other relative strengths. AR 1963-67 (doc. 18-4). This, when read in conjunction with the prior cognitive testing administered by the speech pathologist (which was comparative and showed cognitive decline across all metrics) and the longitudinal record (which evinces some waxing and waning of mental symptoms, but overall, more and more impairment associated with the progression of YOPD) supports, rather than detracts from, the continuance of plaintiff's LTD benefits. AR 1262-67, 1415-17 (doc. 18-3). Finally, the absence of validity testing does not mean that Dr. Sherman understated plaintiff's abilities – it simply means that the validity of the test results she obtained was unconfirmed. *See* AR 3401 (doc. 18-7) (Dr. Lin recognizing that, due to the lack of "validity measure[,] the validity of [Dr. Sherman's] results is unknown").

9. Defendant further implies that its independent reviewing physicians provided a more reliable assessment of plaintiff's condition. *See, e.g.*, Def.'s Rule 52 Mot. 32 (doc. 25). But defendant's position is clearly at odds with the actual record before the Court. Dr. Morcos's November 2024 opinion contained and relied on information from another claim file, and Dr. Lin's May 2025

opinion repeated and relied, in part, on that same inaccurate information. AR 1020, 3397-3401 (doc. 18). As noted, medical and other records subsequent to Dr. Antaki's opinion show that plaintiff's condition continued to deteriorate and also contextualize travel and business activities engaged in by plaintiff in 2023 and 2024. And Dr. Rhymer's opinion was focused exclusively on Dr. Sherman's February 2022 report, which was rendered nearly three years prior to the date that defendant determined plaintiff was no longer qualified for LTD benefits. Additionally, the Court denotes that defendant's independent reviewing physicians made much of plaintiff's daily activities as documented in the surveillance report and online – activities that her providers were aware of and encouraged – in assessing her claim. However, an independent review of the record reveals that these activities were relatively minimal, not transferrable to sustained employment, and consistent with the medical record and plaintiff's other self-reports. *Cf. Rabbat*, 894 F.Supp.2d at 1322 ("there is not a logical incompatibility between working full time and being disabled from working full time . . . A desperate person might force himself to work despite an illness that everyone agreed was totally disabling . . . Yet even a desperate person might not be able to maintain the necessary level of effort indefinitely") (quoting *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003)).

10. Although no special deference is owed to plaintiff's treating providers, "this does not mean that a district court, engaging in a *de novo* review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative." *Id.* (quoting *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006)). Here, the Court finds that the treating relationships of Dr. Anderson, Ms. Pfeiffer, and Ms. Brown allowed them to personally observe and chronicle the effects of plaintiff's YOPD and assess the credibility of her reports of cognitive decline, balance and fine motor problems, and pain. Each provider examined

plaintiff multiple times over many years. In contrast, none of defendant's consulting physicians personally examined plaintiff and none could observe either the effects of her YOPD on her ability to function or assess first-hand the credibility of her reports. Given the complex medical issues surrounding this case – involving intertwined mental/cognitive and physical impairments – the Court finds that Dr. Anderson's medical opinions (and to a lesser extent, those of Ms. Pfeiffer and Ms. Brown) are more reliable and probative of plaintiff's condition than the consulting physician reports.

11. In addition to the medical evidence, the statements provided by plaintiff and her partner and friend are persuasive evidence of total disability. AR 2070-74 (doc. 18-5). As described above, this evidence consistently describes myriad limitations – such as problems with processing speed, concentration, word finding, and fatigue – that preclude sustained work activity. Moreover, nothing in the objective medical record contravenes these statements.

12. While not dispositive, the SSA's award of disability benefits to plaintiff "is probative evidence that [she] is totally disabled" in the context of an ERISA case. *Rabbat*, 894 F.Supp.2d 1311 at 1323. The fact that the SSA awarded plaintiff benefits as of November 2022 and continued them through the relevant time period – a fact which defendant wholly fails to meaningfully reconcile except to note that it is not bound by the SSA decision and relied on subsequent evidence – supports plaintiff's claim for LTD benefits. *Id.*; Def.'s Resp. to Rule 52 Mot. 27-29 (doc. 28); Def.'s Reply to Rule 52 Mot. 9-10 (doc. 30).

13. In sum, the evidence described above demonstrates that plaintiff suffers from a chronic, degenerative condition that results in cognitive impairments and fatigue which prevent plaintiff from attending work on a reliable and consistent basis, and, when at work, concentrating on her

duties. The Court thus concludes that plaintiff is unable to perform the duties of her position or the duties of any occupation for which she is qualified or may become qualified.

## CONCLUSION

For the foregoing reasons, defendant's Motion for Judgment (doc. 25) is denied, and plaintiff's Motion for Judgment (doc. 26) is granted. Plaintiff is entitled to reinstatement of LTD benefits effective November 27, 2024. Within 30 days of the date of this Order, the parties shall meet and confer to address the specific amount of back benefits (including interest), as well as reasonable attorney fees and costs, and then submit a stipulated proposed form of judgment. Plaintiff's request for oral argument is denied as unnecessary.

IT IS SO ORDERED.

DATED this 15th day of September, 2026.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge